UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



FILED
SEP -9 2015
CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

ROY RUSHA,

    Plaintiff,

v.

ADAM M. EDELMAN, M.D., *et al.*,

    Defendants.
_____/

Case No. 13-13644

Hon. John Corbett O'Meara

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the court is Defendants Corizon Health, Inc., Adam M. Edelman, M.D., Lisa Reeves, M.D., Ramesh Kilaru, M.D., and Badawi Abdellatif, M.D.'s motion for summary judgment, which has been fully briefed.

### BACKGROUND FACTS

Plaintiff Roy Rusha alleges that he did not receive proper medical care while in prison, in violation of the Eighth Amendment. Rusha was incarcerated under the supervision of the Michigan Department of Corrections from September 19, 2010, until August 30, 2012. He contends that just prior to entering prison, in July 2010, he was diagnosed with multiple sclerosis ("MS"). He also alleges that he was diagnosed with a seizure disorder several years earlier. Rusha claims that Defendants failed to provide appropriate care for his conditions. Defendants are

Adam M. Edelman, M.D., Lisa Reeves, M.D., Ramesh Kilaru, M.D., Badawi Abdellatif, M.D., and Corizon Health, Inc., which provides health care services to prisoners on behalf of the MDOC.

Rusha has an extensive medical history, including seizures, mental health problems, alcoholism, and benzodiazepine dependency. Medical records from before and after his incarceration document providers' concerns that he engaged in drug-seeking behavior. See Defs.' Ex. A.

Rusha was incarcerated at Mound Correctional Facility beginning October 20, 2010. There, he was treated by Dr. Kilaru and Dr. Reeves, in consultation with Dr. Edelman. Dr. Kilaru first saw Rusha on December 3, 2010, for a chronic care visit. Defs.' Ex. J at 1-3. Rusha told Dr. Kilaru that he had been diagnosed with MS and a seizure disorder. He was taking Dilantin and Tegretol, both anti-seizure medications. Dr. Kilaru prescribed additional anti-seizure medication (Klonopin, a benzodiazepine) at Rusha's request and sought to obtain hospital records supporting the diagnosis of MS. Id.

Dr. Reeves saw Rusha several times in December 2010 after he received treatment in the emergency room for seizures. Defs.' Ex. J at 18-31. Dr. Reeves requested a higher does of Klonopin to control Rusha's seizures ("higher dose controls [seizures] better per [patient]"); however this request was deferred so that

Rusha's blood levels of Dilantin and Tegretol could be checked first. Id. at 24-25. Dr. Reeves noted that Rusha's MS needed to be confirmed by a review of his records, which had not arrived. Id. at 30. On December 30, 2010, Dr. Reeves recommended that Rusha be transferred to the infirmary for observation as a result of his frequent seizures. Id. at 32.

Dr. Reeves discussed Rusha's case with a Dr. Stukey, who suspected that Rusha had pseudoseizures of psychiatric origin, rather than actual seizures. Defs.' Ex. J. at 34. On January 4, 2011, Dr. Reeves informed Rusha that his request to raise his dose of Klonopin was deferred and that his Vicodin order was discontinued. Dr. Reeves noted that "[patient] very angry that he cannot have narcotics/vicodin for generalized body aches/muscle aches due to [seizures] and angry that he cannot have higher dose of klonopin." Id. at 34. She also noted that she need to verify the diagnosis of MS before she could prescribe MS medication. Id. at 35.

On January 6, 2011, Dr. Reeves noted that "dr edelman reviewed old records on pt that showed he has history of pseudosz's." Id. at 39. Dr. Reeves requested a helmet for Rusha to protect his head from injury on January 12, 2011. She noted that Rusha's levels of anti-seizure medication were "therapeutic." Id. at 40.

On January 18, 2011, Dr. Reeves discussed the possibility with Rusha that he was having pseudoseizures. See Id. at 46-47. She also reviewed some pre-incarceration records she received from Wyandotte Hospital, including an MRI report and spinal fluid analysis. Based upon these records, Dr. Reeves concluded that "we do not have enough information to make a diagnosis of multiple sclerosis." Id. at 46. She obtained another records release from Rusha so that additional information, such as neurologist records and an EEG report, could be requested.

Dr. Reeves saw Rusha on February 17, 2011, because "patient has questions regarding what pseudoseizures are." Id. at 51. Dr. Reeves "[e]xplained to patient that records arrived from outside hospital regarding admission pre-incarceration. Informed him that EEG was normal and did not show any seizure activity.... Reassured patient that episodes that he has exhibited in the infirmary are not seizures but rather are pseudoseizures." Id. Dr. Reeves also explained the records she received were insufficient to support a diagnosis of MS. Id.

On March 3, 2011, Dr. Reeves was summoned to evaluate Rusha, who was "on the floor in the infirmary.... patient was sitting on his chair watching television, then patient was on the floor." Id. at 56. Dr. Reeves examined Rusha and found "no neurologic deficit on examination." Id. She also spoke with Dr.

-4-

Edelman about this episode, Rusha's 2010 MRI, and the spinal fluid analysis. Dr. Reeves reported:

> [Dr. Edelman] states that the patient does not have any neurologic deficit and has no symptoms or signs of multiple sclerosis and thus there is no medical indication for any treatment for multiple sclerosis. He also stated that mental health services needs to follow up on this patient regarding his pseudoseizures and that the patient should be instructed to stop having pseudoseizures.

Id. at 57. On March 7, 2011, Dr. Reeves again discussed pseudoseizures with Rusha and the fact that the medical evidence did not support a diagnosis of MS. Dr. Reeves informed Rusha that his anti-seizure medication should be discontinued as not medically necessary. Id. at 58-59, 61. Dr. Reeves reported Rusha was "displeased" that the anti-seizure medication was being discontinued. Id. at 61.

Dr. Reeves saw Rusha on April 18, 2011, and noted that he presented with pseudoseizures and muscle spasms. Dr. Reeves again noted that there was no necessity to prescribe anti-seizure medication and that Rusha "does not have criteria to make any diagnosis of mult. sclerosis. No neuro deficit." Id. at 63.

Dr. Kilaru saw Rusha on May 10, 2011; Rusha "was angry about him not being treated for his seizures and MS." Id. at 7. Dr. Kilaru advised that he would review Rusha's records and get back to him; "further discuss with the medical

team and treat as needed." Id.

Dr. Kilaru received Rusha's MRI result from May 10, 2011, which showed "no acute changes and [previous] lesion size is even smaller," which is inconsistent with a diagnosis of MS. Id. at 9. Dr. Kilaru stated that he "[a]dvised against seizure medication and [m]ove him out of the Infirmary.... Inmate says he did not understand results. He insisted that a Neurologist who saw him and did the LP told him he has MS. Inmate was quite upset." Id.

On May 31, 2011, Dr. Kilaru saw Rusha after he returned from another ER visit. Dr. Kilaru wrote: "He gave me a history that he had 9 seizures. He says his left side is weak since his 9 seizures and he was found sitting in a wheel chair. When questioned he said the wheel chair does not belong to him. He wanted to know when he is going to be treated for his MS and seizures." Id. at 10. Dr. Kilaru's assessment was "pseudoseizures" and "illness, factitious." Id. Dr. Kilaru discussed the case with Drs. Reeves and Steele and recommended that Rusha be transferred from the infirmary to the general population. Id. See also Defs.' Ex. J at 65.

On June 9, 2011, Rusha was hospitalized after complaining of muscle spasms. His hospital discharge papers stated a diagnosis of MS. Dr. Reeves requested a prescription of pain medication (Norco) and muscle relaxant

(Baclofen). See id. at 67-70. On June 20, 2011, Dr. Reeves documented that Rusha had a spinal fluid test done at the Detroit Medical Center, but that there was in insufficient specimen to perform the test needed to rule out MS. Id. at 72. On June 22, 2011, Dr. Reeves reviewed records received from Oakwood Hospital from 2010. At Oakwood, a doctor told Rusha he had pseudoseizures. His brain MRI was "unremarkable" with a "small colloid cyst." Id. at 73.

On June 24, 2011, Dr. Kilaru saw Rusha for "possible MS," hearing problems, and neck pain. Dr. Kilaru noted Rusha had muscle weakness in his left leg. He noted that there was no documentation that Rusha had trouble hearing and that Rusha should try neck exercises. He also noted: "schedule chronic care clinic Neurological." Id. at 14.

On June 29, 2011, Dr. Kilaru saw Rusha for "possible MS" and swelling in his left leg. He noted that "recent records not available from 6/7/11. With the records available so far a definitive diagnosis of MS could not be concluded." Id. at 16.

On July 27, 2011, Rusha was transferred to Macomb Correctional Facility. He saw a physician's assistant, Patrick Geml, on August 5, 2011, complaining of pain in his arm, back, and left leg and requested Baclofen, which had been discontinued. Geml noted that "cannot restart baclofen and he does not want

formulary meds. does not appear to be in stated level of pain esp since he has no active RX for pain." Defs.' Ex. J at 78. Geml also noted that Rusha's records stated that "he does not meet the criteria for MS." Id. at 77.

Geml saw Rusha again on September 13, 2011, complaining of left arm numbness. Geml noted that "he says he is wheelchair bound [due to] weakness in his left leg. [C]ustody has recently shown me video of him abruptly rising from his wheelchair twice to confront another inmate." Id. at 79. Geml treated Rusha for a rash and contacted Drs. Edelman and Coleman to get other treatment recommendations. Id. at 80.

On December 1, 2011, Geml noted: "Consulted with Dr Coleman who recommends the following: Patient has been given a diagnosis of MS based off MRI findings, but has not shown consistent objective findings to support that this disease is in an active stage. Many cases of MS are quiescent and not in need of treatment, as it appears in this case. We will continue to watch and monitor him for consistent objective findings, and if they are present, will consider treatment options." Id. at 82.

Rusha saw Dr. Kilaru on December 14, 2011, for "possible multiple sclerosis, wants wheel chair gloves, hypertension and rash." Defs.' Ex. J at 74. Dr. Kilaru noted that "[t]his patient was extensively counseled and advised that there

is no immediate need for referral for the MS." Dr. Kilaru increased Rusha's blood pressure medication, gave him cream for his rash, and ordered that he be given new wheelchair gloves. Id. at 75.

Rusha saw Dr. Abdellatif several times beginning in January 2012. On January 19, 2012, Dr. Abdellatif noted that Rusha asked to see an outside doctor at his own expense for possible multiple sclerosis. Dr. Abdellatif stated that "he doesn't need my approval for that." He also noted that "Strangely enough he tells me that he doesn't have any feeling or movement at his LLE [lower left extremity] later he says he has sever[e] spasms at different parts of the LLE causing sever[e] pains." Id. at 84.

On March 28, 2012, Rusha saw Dr. Abdellatif and reported "his is having feeling in L foot for the last 3 weeks and able to walk with a walker for short period and getting better." Id. at 87-88. On May 15, 2012, Dr. Abdellatif noted "patient with possible Multiple sclerosis, advanced from wheel chair to quad can a few weeks ago, having muscle aches and spasms since started walking. . . ." Id. at 89.

On June 15, 2012, Dr. Abdellatif updated Rusha's chart after receiving records from a hospital stay on June 8, 2011: "1. Acute MS exacerbation 2. Seizure diagnosis neurology recommend holding off treatment, records from

Henry Ford reviewed, no evidence of seizure activity on multiple EEGs. . . . Numbness of left LE, possibly secondary to [MS]." Defs.' Ex. J at 93.

On June 22, 2012, Rusha saw Dr. Abdellatif after he fell and complained of neck pain. Rusha was taken to the hospital in an ambulance. Id. at 97-98. After he was discharged, Dr. Abdellatif saw Rusha again, noting "Discharged from the hospital yesterday with diagnosis of acute relapsing MS, with spasms, and pain all over body." Id. at 99. Dr. Abdellatif stated that Rusha was "discharged from the hospital on Prednisone, baclofen, Dilantin and Vicodin." Dr. Abdellatif continued these medications. Id. at 102.

Dr. Abdellatif conducted a chart review on August 3, 2012, noting "he has extensive admissions to the hospitals for many reasons including Alcohol intoxications, Pseudoseizures and had multiple EEG that were normal including EEG when he had a "Seizure" during the EEG and still the EEG was normal. He had MRI 4/24/2010 showing suspicious demylenating lesion, but another MRI done 6/2/2012 was normal, a third MRI done 5/24/2011 suspecious (sic) lesions likely represent MS another recent MRI from a recent admission with again suspecious (sic) white matter lesions. It is a confusing picture and he should follow [up] with his PCP when he paroles very soon for further clarification and evaluation." Defs.' Ex. J at 108.

Dr. Abdellatif obtained additional records from Rusha's June 2012 hospital admission on August 10, 2012. Dr. Abdellatif noted: "reports from his admission to the hospital on 6/24/12 and discharge on 6/27/2012 with possible MS exacerbation, history of Seizure, non compliance, possible breakthrough Seizure, consults talk about same diagnosis and raises questions about these diagnosis, one consult raises the question about the LLE paralysis as 'possible malingering.'" Id. at 110. Rusha's brain MRI ("exam quality is degraded secondary to motion") showed a result "likely represent multiple sclerosis given the clinical history of such. no evidence of inhancing intracranial lesions to suggest active demylination." Id. at 110.

On August 30, 2012, Rusha was released from prison on parole. Defendants state that, after Rusha was released, Dr. Abdellatif received a CT report from Rusha's June 2012 hospital admission showing that he had cervical spondylosis, which can cause leg weakness and difficulty walking. See Defs.' Ex. M. One of Defendants' experts has opined that "the emergency department physicians were so focused or distracted by the preexisting label of MS, that they did not attribute the symptoms and signs in limbs adequately to the cervical spinal stenosis." Defs.' Ex. P at 2-3.

Defendants have submitted expert reports from John Bonema, M.D.

-11-

(internal medicine); Thomas Graves, M.D. (family medicine); Changrapani Ranganathan, M.D. (neurology); and Mark Hornyak, M.D. (neurosurgery). These doctors concurred with Defendants assessment that Rusha did not meet the objective diagnostic criteria for MS and that he had pseudoseizures. Plaintiff contends that Defendants ignored Plaintiff's history of MS and refused to treat his condition, resulting in a needless progression of his disease. Plaintiff has submitted an affidavit from his treating physician, Omar Ahmad, M.D., opining that Plaintiff has MS and had it before he was incarcerated in September 2010. Defendants have moved to strike Dr. Ahmad's affidavit, arguing that Plaintiff did not timely disclose him as an expert or serve an expert report pursuant to Fed. R. Civ. P. 26(a)(2). Defendants seek summary judgment in their favor.

## LAW AND ANALYSIS

Plaintiff's claim arises under the Eighth Amendment. A prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001). An Eighth Amendment claim has two components, one objective and the other subjective. Comstock, 273 F.3d at 702. "To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" Id.

(quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." Id. (citing Farmer, 511 U.S. at 837). "The requirement that the official [has] subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." Comstock, 273 F.3d at 703 (citing Estelle, 429 U.S. at 106).

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."

Id. at 703 (citations omitted).

Essentially, Plaintiff alleges that, because of a financial disincentive to

provide care, Defendants ignored his diagnosis of MS and chose not to treat it. The evidence demonstrates, however, that Defendants did not "ignore" Plaintiff's MS, but that Defendants considered the issue and did not believe Plaintiff met the criteria necessary for an MS diagnosis. See Westlake v. Lucas, 537 F.2d 857, 860 n.5 (1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). Thus, assuming Plaintiff has met the objective component of the deliberate indifference test, he has not met the subjective one. Viewing the evidence in the light most favorable to Plaintiff, the failure to treat his alleged MS amounts to a misdiagnosis, rather than rising to the level of deliberate indifference. Plaintiff has not demonstrated that any of the individual physician defendants had the culpable state of mind – equivalent to criminal recklessness – to establish deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 834, 839-40 (1994).

Because Plaintiff has not established a constitutional violation, or identified an unconstitutional policy, his claim against Corizon must also be dismissed. See Bowman v. Corrections Corp. of America, 350 F.3d 537, 545-46 (6th Cir. 2003).

The consideration of Dr. Ahmad's affidavit, to which Defendants object,

does not change the analysis. Nonetheless, the court finds that to the extent Dr. Ahmad provides expert testimony, his affidavit cannot be considered. Plaintiff did not timely disclose any expert witnesses or submit expert reports in compliance with Fed. Rule Civ. P. 26, which were due July 31, 2014. Pursuant to Fed. R. Civ. P. 37(c)(1), [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless." Plaintiff has not provided justification for this failure, nor is the late disclosure – in his response brief – "harmless." See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp., 596 F.3d 357, 369 (6th Cir. 2010) ("[T]he test is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.").

## ORDER

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED.

Dated: September 9, 2015

/s/ John Corbett O'Meara
John Corbett O'Meara
United States District Judge